

F I L E D

AUG 2 0 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION



FILED UNDER SEAL—FILED UNDER SEAL—FILED UNDER SEAL

| | |
|---|---|
| United States of America )<br>)<br>*ex rel.*, )<br>)<br>Kimthy Chao )<br>)<br>Plaintiffs, )<br>)<br>)<br>)<br>v. )<br>)<br>Calnet, Inc., )<br>12359 Sunrise Valley Dr. )<br>Reston, VA 20191 )<br>)<br>And )<br>)<br>Kaleem Shah )<br>1420 Wynhurst Lane )<br>Vienna, VA 22182 )<br>)<br>And )<br>)<br>L-3 Communications Corp., )<br>f/k/a )<br>L-3 Titan Corp., )<br>1900 Campus Commons Dr. )<br>Reston, VA 20191 )<br>)<br>Defendants. ) | *Unsealed per Order 5/31/12*<br><br>FILED UNDER SEAL PURSUANT TO<br>31 U.S.C. §3729 ET SEQ.<br><br>DO NOT ENTER INTO PACER<br>Case No. 1:09cv946-GBL/TCB<br><br>JURY TRIAL DEMANDED |

**RELATOR'S FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

Relator Kimthy Chao hereby files his First Amended Complaint on behalf of the United States, as well as on his own behalf, pursuant to the *qui tam* provisions of the Federal False Claims Act (31 U.S.C. §3729 *et seq.*)("FCA") and in support thereof alleges as follows.

12

## INTRODUCTION AND BACKGROUND

1. Relator Kimthy Chao ("relator" or "Mr. Chao") brought this *qui tam* action to recover treble damages, civil penalties, and attorney's fees for damages to the United States. The original complaint was filed on or about August 28, 2009, and this Amended Complaint is filed on or about August 16, 2010.

2. The damages complained of in the original Complaint occurred when Defendants, from mid-2006 to the present, knowingly made and used various false records and statements material to a false claim, knowingly submitted false claims and/or records to the United States for payment, and made various false statements and/or records to conceal overpayments from the United States and/or to avoid or decrease obligations to repay money to the United States.

3. Relator has met procedural requirements prior to filing the initial Complaint under seal. Specifically, as required by 31 U.S.C. §3730(b)(2), prior to filing the original action, relator provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Virginia a statement of all the material evidence and information related to this complaint.

## JURISDICTION AND VENUE

4. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. The court has jurisdiction over this action pursuant to 31 U.S.C. §§ 3732 and 28 U.S.C. § 1331.

5. Venue is proper in this district pursuant to § 3732(a) of the FCA, which provides that "[a]ny action under § 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one Defendant can be

found, resides, transacts business, or in which any act proscribed by section §3729 occurred." At all times material hereto, Defendants regularly conducted substantial business in Virginia in this judicial district and maintained permanent employees and offices in Virginia, within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## PARTIES

6. Relator Kimthy Chao is a resident of Virginia. Relator was employed by defendant Kaleem Shah and defendant Calnet from on or about June of 2005 through the present. Relator serves as the chief financial officer ("CFO") of Calnet, and thus has detailed knowledge of the day to day operations of Calnet, and detailed knowledge of every aspect of Calnet's finances. It is in this employment capacity that relator came to have first-hand knowledge of the information alleged in this complaint.

7. Relator is the original source of this information and has first-hand knowledge of the allegations in this complaint; however, relator states that to the best of his knowledge, none of the facts alleged herein have been publicly disclosed.

8. Upon information and belief, defendant Calnet, Inc. ("Calnet"), is a Maryland corporation headquartered in Virginia, with its primary place of business in Virginia. Calnet has offices in Virginia and California, and does business throughout the world in support of the United States. Such business includes prime contracts with the United States and subcontracts with prime contractors for government work.

9. Defendant Kaleem Shah ("Shah") is a resident of Virginia. Shah is the founder, chief executive officer, and president of Calnet. Shah is also the sole shareholder of Calnet. Upon information and belief, Shah immigrated to the United States in 1985 and received B.S. and M.S. degrees in engineering from Clemson University, and an MBA from George Washington University. At all times relevant hereto, Shah had authority to hire and fire any employee of Calnet, and had authority to submit bills and invoices on behalf of Calnet to the United States for payment. Shah also personally ordered the unlawful acts complained of herein, and personally profited from such unlawful acts. Shah also appears to have failed to observe corporate formalities and to have commingled personal and corporate obligations.

10. Defendant L-3 Communications Corporation ("L-3") is a Delaware corporation doing business in Virginia and throughout the world in support of the United States. L-3 has undergone a period of rapid expansion, including its acquisition of Titan Corporation in June of 2005. Calnet originally had one subcontract at issue in this case with Titan Corporation's Linguist Operations and Technical Support Division ("LOTSD"); when Titan was acquired by L-3, Calnet began doing business with L-3.

## FACTS COMMON TO ALL COUNTS

11. At all times relevant hereto, all Defendants were obligated to obey all federal laws and regulations governing contractual relationships with the United States, including the provisions of the Federal Acquisition Regulations (48 C.F.R. §§1.101 *et seq.*)("FAR"), the Defense Acquisition Regulations (32 C.F.R. §§ 3-

807 *et seq.*)("DFAR") and the Cost Accounting Standards (4 C.F.R. §§301.1 *et seq.*)("CAS").

12. The Federal Acquisition Regulations ("FAR"), codified at Title 48 of the Code of Federal Regulations, specifies the manner in which a government contractor is to measure, assign, accumulate, allocate, and otherwise account for the costs it incurs during its performance of a contract with the United States. FAR also specifies those categories of costs that can be reimbursed under contracts with the United States ("allowable costs") and those types of costs that cannot be reimbursed ("unallowable costs").

### COUNT ONE
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B)
### PRESENTING FALSE CLAIMS FOR PAYMENT OR APPROVAL
### KNOWINGLY MAKING AND USING FALSE RECORDS
### (Against Defendants Calnet and Shah)

13. All of the preceding paragraphs are reincorporated and realleged by reference, herein.

14. On or about January of 2007, Calnet was awarded a $9.2 million prime contract with the U.S. Army Intelligence and Security Command ("INSCOM"). The award was labeled W911W4-07-D-0002, and was for language translation services at Guantanamo Bay, Cuba, among other places.

15. Calnet, in turn, subcontracted part of this service work to a subcontractor; the subcontractor chosen was an Ohio company named Mission Essential Personnel, Inc. ("MEP").

16. The cost of MEP's performance was a "direct cost" in the parlance of the Federal Acquisition Regulations ("FAR").

17. Among other places, at 52.216-7, the FAR sets forth the requirements for a direct cost to be allowable for reimbursement by the United States. Among those requirements is subsection (b)(1)(i) of 52.216-7, which states that only costs actually paid by the prime contractor for the services of a subcontractor can be claimed as costs.

18. Additionally, FAR subsection (b)(1)(ii) of 52.216-7 provides that the term "reimbursable allowable costs" can include costs incurred but not paid only when the contractor is not delinquent in paying the costs of contract performance.

19. Despite these requirements, from on or about July of 2007 through November of 2008, Calnet and Shah presented false claims to the United States and intentionally overbilled the United States for the work of subcontractor MEP on prime contract W911W4-07-D-0002.

20. Such bills were false because from on or about July of 2007 through November 4, 2008, Calnet intentionally refused to pay multiple invoices from subcontractor MEP, and/or such bills were false because Calnet was delinquent in paying the costs of contract performance.

21. Despite Calnet's failure to pay subcontractor MEP from July of 2007 through November of 2008, Calnet billed the United States for the cost of MEP's performance on the subcontract as if the costs were allowable reimbursable costs as defined by FAR. Such bills were presented to the United States by Calnet, and were signed and certified by Shah, despite the fact that he knew they were false.

22. Calnet and Shah submitted these vouchers for interim payments on a government form called a "Standard Form 1034" ("SF 1034").

23. Calnet presented claims on a SF 1034 to the United States for payment via the DFAS Columbus Center in Columbus, Ohio.

24. The false claims submitted by Calnet and Shah include but are not limited to: Voucher # 13327 (on September 27, 2007), Voucher # 13498 (on December 28, 2007), and Voucher # 13500 (also on December 28, 2007.)

25. In addition to the dates outlined above, Calnet presented 23 more false invoices to the United States for payment for costs related to MEP's performance; all 26 invoices were false because Calnet had not paid MEP for the costs of MEP's performance and/or because Calnet was delinquent in paying the costs of MEP's performance.

26. With regard to all of the above actions, Shah and Calnet also knowingly made and/or used false records material to one or more false or fraudulent claims.

27. Calnet represented to the United States that it was paying MEP's invoices on a regular basis by, among other things, including the invoices submitted to Calnet by MEP in the claims Calnet and Shah presented to the United States on the SF 1034.

28. Finally, on or about November 4, 2008, Calnet paid MEP a total of $306,528.25 for all of the work MEP performed from July of 2007 through November of 2008.

29. Calnet, however, had billed the United States the total amount of $357,692.51 for the work of MEP, and had represented to the United States that this amount had been paid to MEP.

30. Additionally, from July of 2007 through November of 2008, Calnet loaded its handling costs (in the amount of 11.37% of each MEP invoice) and its fee (in the

amount of 7.5% of each MEP invoice) onto the claims submitted to the United States, despite the fact that the costs for the work of MEP had not been paid and/or despite the fact that Calnet was delinquent in paying the costs of MEP's performance.

31. In all, Calnet and Shah billed the United States the total amount of $428,238.69 for the work of MEP.

32. Such amounts were falsely billed to the United States, because Calnet and Shah had not paid these costs to MEP at the time the invoices were submitted to the United States for payment, and Shah and Calnet both knew that they had not paid these costs at the time the invoices were submitted to the United States.

33. Alternatively, these invoices were false because Shah and Calnet were delinquent in paying MEP and/or because Shah and Calnet had no intention whatsoever of paying MEP. As a result, Shah and Calnet knowingly presented multiple false claims for payment and/or approval.

34. Each claim presented to the United States under this count was submitted on a "SF 1034" and had supporting documentation consisting of one or more invoices from MEP attached; additionally, each SF 1034 contained the following mandatory certification: "Pursuant to authority vested in me, I certify that this voucher is correct and proper for payment."

35. On each SF 1034, Shah and/or an agent acting directly under his control certified that the voucher presented to the United States was correct and proper for payment, despite the fact that he knew the vouchers were false.

36. The above referenced acts violated the federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) and §3729(a)(1)(B)(2009), and resulted in damages to the United States. Alternatively, the above referenced acts were a violation of §§ 3729(a)(1) and (2) of the False Claims Act and resulted in damages to the United States.

37. WHEREFORE, Relator respectfully requests that the Court enter judgment against DEFENDANTS KALEEM SHAH AND CALNET, INC., JOINTLY AND SEVERALLY, as follows: (a) That the U.S. be awarded three times the damages sustained because of the false claims and fraud alleged in this count; and (b) that a civil penalty of $11,000 be imposed for each of the false claims complained of herein; and (c) that pre-and post-judgment interest be awarded, along with the reasonable attorneys' fees, costs, and expenses incurred by the relator in prosecuting this case; and (d) that the relator be awarded the maximum percentage of the government's recovery pursuant to the False Claims Act; in addition, the relator requests any additional relief the court may deem appropriate.

## COUNT TWO
### VIOLATION OF 31 U.S.C. §3729(a)(1)(G)
### WRONGFUL RETENTION OF OVERPAYMENT/
### MAKING FALSE RECORDS TO CONCEAL AN OBLIGATION TO
### REPAY MONEY TO THE UNITED STATES
### (Against Shah and Calnet)

38. All of the preceding paragraphs are reincorporated and realleged by reference, herein.

39. On contract W911W4-07-D-0002, Calnet and Shah submitted invoices to the United States for payment from July of 2007 through November of 2008 for the work of subcontractor MEP.

40. After loading its handling fee and profit, Calnet billed the United States for, and was paid the total amount of $428,238.69 for the work of MEP on contract W911W4-07-D-0002; of this amount, Calnet represented to the United States that it had paid MEP the total amount of $357,692.

41. Despite Calnet's representations to the United States that it had paid MEP $357,692, Calnet was delinquent in paying MEP and did not pay MEP from on or about July of 2007 through November of 2008.

42. Starting on or about December 10, 2007, Shah began creating false records to conceal the amounts overpaid by the United States and to make it appear as if he had paid MEP. Specifically, Shah began to write checks payable to MEP in the amount of MEP's invoices. Rather than deliver the checks to MEP, however, Shah simply placed the checks in his desk drawer.

43. On the following dates, checks were made payable to MEP in the exact amounts of its invoices: December 10, 2007; December 12, 2007; January 10, 2008; March 31, 2008; April 21, 2008; November 15, 2008 and November 29, 2008. The total amount of these checks was $357,692. Each of these checks was placed in Shah's desk drawer until the check expired.

44. Each check created pursuant to the allegations in this count was a false record; the records were false because they were not created for purposes of paying MEP, but were created for the purposes of concealing overpayments from the United States and concealing Shah's obligation to pay or transmit money to the United States.

45. Calnet eventually paid MEP a total of $306,528 for its work on this contract, on November 4, 2008. As a result, Calnet received an overpayment by the government, which it has not paid back.

46. Rather than return the money to the government, Shah simply paid himself the overpaid amounts as part of his annual compensation in the years 2007 and/or 2008. As a result, Shah received an overpayment from the government, which he has not paid back.

47. The above referenced acts violated the federal False Claims Act, 31 U.S.C. §3729(a)(1)(G)(2009), and resulted in damages to the United States.

48. WHEREFORE, Relator respectfully requests that the Court enter judgment against DEFENDANTS KALEEM SHAH AND CALNET, INC., JOINTLY AND SEVERALLY, as follows: (a) That the U.S. be awarded three times the damages sustained; and (b) that a civil penalty of $11,000 be imposed for each and every false claim defendants submitted to the U.S. and/or caused to be submitted to the U.S.; and (c) that pre-and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses incurred by the relator in prosecuting this case; and (d) that the relator be awarded the maximum percentage of the government's recovery allowed pursuant the False Claims Act; in addition, the relator requests any additional relief the court may deem appropriate.

**COUNT THREE**
**VIOLATIONS OF 31 U.S.C. §3729(a)(1)(A) and (B)**
**KNOWINGLY SUBMITTING FALSE CLAIMS AND/OR CAUSING**
**FALSE CLAIMS TO BE SUBMITTED**
**(Against Shah, Calnet and L-3)**

49. All of the preceding paragraphs are reincorporated and realleged by reference, herein.

50. Many of Calnet's prime contracts and its subcontracts were awarded on a cost plus fee basis ("costs plus" contracts) or a time and materials basis ("T&M Contracts.")

51. A "costs plus fee" contract is a contract in which Calnet's compensation is based upon the allowable direct and indirect costs incurred by the contractor plus a fee.

52. A time and materials contract is a contract in which the compensation is based upon fixed hourly rates for persons working on the contract plus the allowable costs of the materials used in the performance of the contract. The fixed hourly rates include wages, overhead, general and administrative expenses, and profit.

53. Pursuant to FAR, allowable costs fall into two broad categories: (1) direct costs, which can be directly identified with and assigned to a particular contract (FAR 31.202)(48 C.F.R. §31.202); and (2) indirect costs, which cannot be directly identified with and assigned to a particular contract (FAR 31.203)(48 C.F.R. §31.203).

54. Pursuant to FAR, the allowable indirect costs of the government contractor are accumulated into cost pools. A base is selected which has a causal beneficial relationship to the incurrence of the indirect costs. The indirect costs are then distributed to contracts by allocation over the selected base by dividing the indirect costs by the base selected; this results in a numerical percentage. In this way, indirect costs are allocated to contracts in accordance with the benefits received by each contract or subcontract.

55. Because no contractor knows for certain exactly what its indirect costs percentage will be in the future, contractors have to estimate their indirect costs percentages at the time the contractor negotiates for work, and/or at the time they enter into the contract. This estimation results in what is known as a "billing rate" or a "provisional rate;" in other words, the estimated, planned, cost percentage devised at the time of the procurement.

56. FAR 42.701 defines "billing rates" as (1) those established temporarily for interim reimbursement of incurred indirect cost rates, and (2) adjusted as necessary pending establishment of final indirect rates.

57. Thus, parties entering into a cost plus contract, either as a prime contractor or as a subcontractor to a prime contractor, have a duty to estimate provisional rates for reimbursement of indirect costs, and also a duty to adjust those rates as necessary until such time as an actual indirect rate can be calculated.

58. As required by FAR, contractors and subcontractors working on costs plus contracts submit to an audit at the end of the contract's life, at which time the "provisional rates" are evaluated against the actual historical data, and an actual indirect rate is calculated.

59. At all times, contractors have a duty to make their "billing rates" or "provisional rates" as close to the actual costs as possible, to avoid being overpaid or underpaid by the government.

60. FAR 16.301-3(a)(1) provides that cost-reimbursement contracts may only be used when the contractor's accounting system is adequate for determining costs applicable to the contract.

61. FAR 31.203(d) further states that the contractor's method of allocating indirect costs shall be in accordance with standards promulgated by the CAS Board if applicable to the contract; otherwise, the method shall be in accordance with generally accepted accounting principles which are consistently applied.

62. At all times relevant hereto, relator kept and maintained an accounting system sufficient to enable Calnet to enter into costs plus contracts and to allocate indirect costs; in other words, the accounting system was designed to make the provisional billing rates as close as possible to the final indirect rates.

63. However, Shah knowingly and willfully ignored relator's goood-faith provisional rates, as well as the historical accounting data relator used in calculating the provisional rates, when Shah estimated the billing rate or provisional rate for reimbursement of indirect costs on the subcontract with L-3.

64. Shah ignored relator's carefully calculated provisional indirect rate , and  instead fabricated a false provisional indirect rate.

65. The provisional indirect rate fabricated by Shah was higher than relator's good-faith provisional indirect rate so that Shah could obtain an  overpayment from prime contractor L-3 and from the United States.

66. At all times relevant hereto, L-3 had a prime contract with the United States labeled as W911-W4-04-D-0005.  This contract was an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract.

67. At all times relevant hereto, Calnet had a subcontract with L-3.

68. The subcontract between L-3 and Calnet was designated LOTSD-06-S-0022. LOTSD is an acronym for "Linguist Operations and Technical Support Division."

69. Initially, the subcontract between Calnet and L-3 was a time and materials contract, for which L-3 had negotiated the rates with the United States prior to entering into the subcontract with Calnet.

70. As part of that arrangement, Calnet submitted its costs incurred in the performance of the contract to L-3, and was paid on those costs.

71. When the subcontract between Calnet and L-3 was time and materials, L-3 carefully scrutinized Calnet's cost submissions, and rejected Calnet's submissions of costs incurred on several occasions.

72. L-3 carefully reviewed all of Calnet's cost submissions because the subcontract was a time and materials subcontract, for which L-3 had previously negotiated the rates, and L-3 wished to have all of the costs associated with Calnet's performance reimbursed by the United States.

73. During this period of time, L-3 was careful not to let Calnet submit any costs in excess of what was allowed by the agreement with United States.. L-3 did not wish to pay any costs incurred by Calnet which would not be paid by the United States.

74. Because Calnet had repeatedly attempted to bill unallowable costs to the subcontract, and because L-3 had often been forced to make Calnet correct its costs submissions, L-3 was aware of Calnet's billing practices and was aware that Calnet would try to inflate its costs.

75. In May of 2006, the subcontract between Calnet and L-3 became a "cost plus" contract.

76. When the subcontract became a cost plus contract, L-3 was no longer responsible to pay any unallowable costs submitted by Calnet; instead, L-3 simply passed those unallowable costs onto the United States.

77. Because the work of this contract was IDIQ, delivery order numbers were provided for Calnet to bill its work. Those numbers include, but are not limited to, DO 25, DO 27, DO 28, DO 59, DO 60, DO 61, DO 63, DO 66, DO 115, DO 116 and DO 117.

78. The cost plus subcontract agreement between L-3 and Calnet contained provisions incorporating numerous FAR provisions, including but not limited to FAR 52.216-7, FAR 52.232-20 and FAR PART 31.

79. Once subcontract LOTSD-06-S-0022 became cost plus, Calnet was required to submit provisional indirect rates per DO number to prime contractor L-3.

80. Calnet was also required to submit certifications to L-3 that Calnet's billing rates or provisional rates for indirect costs were estimated in good faith and were based on actual historical accounting data.

81. L-3, in turn, had an obligation to collect this cost or pricing data from Calnet and had an obligation to submit these estimates of the provisional indirect rates for its performance to the government.

82. The provisional billing rates for L-3 incorporated the provisional billing rates of Calnet; L-3 thus had an affirmative obligation to take reasonable steps to determine whether Calnet's estimates were accurate.

83. For example, as part of Calnet's ongoing obligations to L-3, in September of
2006, relator prepared and submitted to Shah an estimate of Calnet's indirect cost
rates.

84. Relator estimated an indirect rate of 1.434% of the direct labor costs, and
prepared a memorandum for Shah's signature setting forth this estimated indirect
rate and all other contractual requirements. Relator's good-faith estimate was
based on the following estimated costs per Delivery Order number:

| | |
|---|---|
| DO 59 | $4,084,638.00 |
| DO 60 | $2,699,150.56 |
| DO 61 | $    54,381.99 |
| DO 63 | $    36,644.93 |
| DO 66 | $    36,644.93 |
| TOTAL: | $6,911,460.41 |

85. As required by FAR, relator also submitted seven pages of historical accounting
data to show the full basis for his calculations.

86. When relator submitted this cost estimate to Shah, Shah rejected this estimate, and
told relator "That is not high enough" or words to that effect.

87. At the time Shah rejected relator's estimate, Shah was aware that relator's
estimate was based on historical accounting data and had a proper basis. Shah
was also aware of the seven pages of historical accounting data relator prepared to
show the basis for his estimate.

88. Shah then prepared his own intentionally false estimate of the indirect costs
associated with this subcontract with L-3. Unlike relator's estimates, Shah's
estimates were complete fabrications without a proper basis in the historical
accounting data, and were intentionally overestimated so as to obtain the

maximum overpayment from the United States. Shah also created a primitive forgery of relator's seven pages of historical accounting data; he forged this data to make it appear as if he had met the requirements of FAR.

89. Shah created an indirect cost rate of 1.53% for the subcontract with L-3. The numbers Shah used to arrive at that number were as follows, per Delivery Order number:

| | |
|---|---|
| DO 59 | $4,345,784.00 |
| DO 60 | $2,870,161.90 |
| DO 61 | $    57,806.34 |
| DO 63 | $    39,018.88 |
| DO 66 | $    36,018.88 |
| TOTAL: | $7,351,790.63 |

90. On or about September 22, 2008, Shah submitted his falsified memorandum and falsified historical accounting data to L-3 Vice-President Haze E. Hanna.

91. As part of that memorandum, Shah falsely certified that Calnet had used actual historical accounting data to arrive at its calculations, and that Calnet's estimation was made in good faith.

92. From September of 2006 through May of 2008, Calnet billed this subcontract for an indirect cost rate of 1.53% of the direct labor costs for the following delivery order numbers: DO 59, DO 60, DO 61, DO 63 and DO 66. These bills were false because they were intentionally inflated by Shah and because they were not based in historical accounting data.

93. In addition to the above DO numbers, Shah's intentionally falsified estimates and submitted false claims on DO 25, DO 28, DO 27, DO 115, DO 116 and DO 117 on the same subcontract.

94. At the same time that Calnet was billing the subcontract with L-3 at an indirect cost rate of 1.53% of the direct labor costs (i.e., from September of 2006 through May of 2008) the actual indirect cost rate for Calnet's work was much lower, and Shah was aware that it was much lower.

95. For example, in 2007, the actual indirect cost rate for Calnet prime contract W911W4-08-D-0001 was 1.446% of the direct labor costs.

96. The same cost pools should have been used to calculate both the provisional indirect rate for Calnet prime contract W911W4-08-D-001 and the provisional indirect cost rate on the subcontract between Calnet and L-3 (i.e., LOTSD-06-S-0022).

97. As all times relevant, L-3 was aware that Calnet had tried to submit unallowable costs for payment while the subcontract was time and materials; L-3 was also aware that it had been forced to scrutinize Calnet's costs submissions and filter out unallowable costs submitted by Calnet.

98. Despite this knowledge, L-3 stopped scrutinizing the costs submissions of Calnet after the subcontract switched to a cost plus basis.

99. L-3 stopped scrutinizing the cost submissions of Calnet after the contract became cost plus because L-3 was no longer responsible for those costs.

100.    L-3 also failed to take reasonable steps to insure that Calnet did not submit unallowable costs on the subcontract.

101.    At all times relevant, L-3 was aware that Calnet had a prime contract for work identical to the work of LOTSD subcontract; L-3 was also aware that Calnet

billed its own prime contract with the United States at a lower rate than it billed L-3.

102.     Alternatively, L-3's failure to ask Calnet for the provisional and actual indirect rate for Calnet's prime contract amounts to reckless disregard or deliberate ignorance of the truth or falsity of Calnet's claims.

103.     Shah knew that his estimated indirect cost rate of 1.53 was not a good-faith estimate; at the same time, he knew that relator's estimated indirect cost rate was a good-faith estimate and was based in historical accounting data.  Shah ignored relator's lower cost estimate, despite his knowledge that relator's estimates were based in historical data and were accurate, in order to obtain the maximum overpayment from the United States.

104.     As a result of Shah's intentionally false provisional indirect rates, and as a result of L-3's knowing use of Shah's intentionally false indirect provisional rates, from September of 2006 through May of 2008, Shah, Calnet and L-3 submitted multiple false invoices to the United States for payment on DO 25, DO 27, DO 28, DO 59, DO 60, DO 61, DO 63, DO 66, DO 115, DO 116 and DO 117.

105.     In the alternative, L-3 showed reckless indifference to the truth or falsity of Shah's provisional indirect rates.

106.     Because Calnet and Shah fabricated an intentionally false indirect cost percentage, both defendants knowingly made or used false records or statements material to a false claim.

107.     Calnet and Shah knowingly submitted false invoices to L-3 with the intention that L-3 would in turn submit those false invoices to the United States

for payment; Shah and Calnet submitted those false invoices in order to be paid with money that ultimately came from the United States.

108.     At all times relevant hereto, defendant L-3 had a duty to submit its own estimated provisional billing rates to the United States. Because the provision billing rates of L-3 would include the provisional billing rates of Calnet, L-3 had a duty to take reasonable steps to make sure that its subcontractors did not submit wildly inaccurate provisional billing rates.

109.     Despite this duty, L-3 showed reckless disregard of the truth or falsity of Calnet's invoices and/or deliberate ignorance of the truth or falsity of the provisional billing rates submitted by Calnet and Shah, and as a result, L-3 submitted multiple false claims to the United States for payment.

110.     Every invoice submitted by Shah and Calnet on this subcontract was false; and, in turn, every invoice L-3 presented for payment that included the costs of Calnet was false.

111.     The above referenced acts violated the federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) and (B)(2009), and resulted in damages to the United States. Alternatively, the above referenced acts were a violation of §§ 3729(a)(1) and (2) of the False Claims Act and resulted in damages to the United States.

112.     WHEREFORE, Relator respectfully requests that the Court enter judgment against DEFENDANTS KALEEM SHAH, CALNET, INC., and L-3 COMMUNICATIONS CORPORATION, JOINTLY AND SEVERALLY, as follows: (a) That the U.S. be awarded three times the damages sustained as a result the false claims and fraud alleged in this count in an amount to be

determined at trial; and  (b) that a civil penalty of $11,000 be imposed for each

and every false claim defendants presented to the U.S. and/or caused to be

presented to the U.S.; and (c) that pre-and post-judgment interest be awarded,

along with reasonable attorneys' fees, costs, and expenses incurred by the relator

in prosecuting this case; and (d) that the Relator be awarded the maximum

percentage of the government's recovery allowed pursuant the False Claims Act;

in addition, the relator requests any additional relief the court may deem

appropriate.

**COUNT FOUR**
**VIOLATION OF 31 U.S.C. §3729(a)(1)(G)**
**WRONGFUL RETENTION OF OVERPAYMENT/**
**MAKING FALSE RECORDS TO CONCEAL AN OBLIGATION TO**
**REPAY MONEY TO THE UNITED STATES**
**(Against Shah, Calnet and L-3)**

113.      All of the preceding paragraphs are reincorporated and realleged by

reference, herein.

114.      As alleged above in Count Three, from September of 2006 through May

of 2008, Shah, Calnet and L-3 knowingly overbilled the United States.

115.      Shah, Calnet and L-3 thus received multiple overpayments which they had

an affirmative obligation to return to the United States.

116.      Instead of returning this money to the United States, Shah and Calnet

simply kept the money and/or Shah paid it to himself at the end of the year, as a

result of which the United States has been damaged.

117.      Instead of returning the money to the United States, defendant L-3 simply

kept the money, as a result of which the United States has been damaged.

118.    The above referenced acts violated the federal False Claims Act, 31

U.S.C. §3729(a)(1)(G)(2009), and resulted in damages to the United States.

119.    WHEREFORE, Relator respectfully requests that the Court enter

judgment against DEFENDANTS KALEEM SHAH, CALNET, INC., AND L-3

COMMUNICATIONS CORPORATION, JOINTLY AND SEVERALLY, as

follows:  (a) That the U.S. be awarded three times the damages sustained as a

result of the false claims and fraud alleged in this count in an amount to be proved

at trial; and  (b) that a civil penalty of $11,000 be imposed for each and every

false claim that defendants presented to the U.S. and/or caused to be presented to

the U.S.; and (c) that pre-and post-judgment interest be awarded, along with

reasonable attorneys' fees, costs, and expenses incurred by the relator in

prosecuting this case; and (d) that the relator be awarded the maximum percentage

of the government's recovery allowed pursuant the False Claims Act; in addition,

the relator requests any additional relief the court may deem appropriate.

### COUNT FIVE
### VIOLATIONS OF 31 U.S.C. §3729(a)(1)(A) and (B)
### KNOWINGLY SUBMITTING FALSE CLAIMS AND/OR CAUSING
### FALSE CLAIMS TO BE SUBMITTED
### (Against Shah and Calnet)

120.    All of the preceding paragraphs are reincorporated and realleged by

reference, herein.

121.    At all times relevant hereto, Calnet had a third prime contract with

INSCOM designated as W911W4-08-D-0001; the work of the contract was

further subdivided into delivery order numbers  Initially, each delivery order

number for this prime contract was awarded on a cost plus fee basis.

122.    On or about June 25, 2009, the United States announced that it was converting this contract into a firm-fixed price contract; however, because some delivery order numbers were issued later than others, not all delivery orders would become firm-fixed price at the same time.

123.    On July 15, 2009, Shah personally directed Calnet employees including, but not limited to, Program Manager Shane Riley, to charge the labor hours his employees spent working on the new firm-fixed price delivery order numbers to a cost account instead of charging it to the firm-fixed price delivery order number as a direct labor cost.  Prior to this change, all of these employees charged directly to the contract when they worked on delivery orders that were cost plus fee contracts.

124.    Shah required his employees to falsely charge their work time and costs with the intent of inflating the overhead costs and passing these costs under firm fixed price contracts to costs plus contracts.

125.    Shah and Calnet took these steps with the intent of submitting false claims for payment to the United States; such actions were plainly fraudulent because Shah told his employees to charge their work to the wrong delivery order numbers.

126.    One or more Calnet employees working for Shane Riley did in fact charge their time spent working on firm fixed price delivery orders to a cost account.

127.    The above-referenced acts constitute a violation of § 31 U.S.C. §3729(a)(1)(A) and (B)(2009) of the False Claims Act, and resulted in damages to the United States.  Alternatively, the above referenced acts were a violation of §§

3729(a)(1) and (2) of the False Claims Act and resulted in damages to the United States.

128.     WHEREFORE, Relator respectfully requests that the Court enter judgment against DEFENDANTS KALEEM SHAH AND CALNET, INC., JOINTLY AND SEVERALLY, as follows:  (a) That the U.S. be awarded three times the damages sustained in an amount to be proved at trial; and  (b) that a civil penalty of $11,000 be imposed for each and every false claim that defendants presented to the U.S. and/or caused to be presented to the U.S.; and (c) that pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses incurred by the relator in prosecuting this case; and (d) that the relator be awarded the maximum percentage of the government's recovery allowed pursuant the False Claims Act; in addition, the relator requests any additional relief the court may deem appropriate.

## COUNT SIX
### VIOLATIONS OF 31 U.S.C. 3729(a)(1)(A) and (B)
### PRESENTING OR CAUSING TO BE PRESENTED A FALSE CLAIM
### KNOWINGLY MAKING AND/OR USING A FALSE RECORD
#### (Against Shah and Calnet)

129.     All of the preceding paragraphs are reincorporated and realleged by reference, herein.

130.     On March 1, 2010, in his official role as CFO of Calnet, Chao calculated the provisional billing rate for 2010.  Chao's provisional G&A rate for 2010 was 9.36%.  This percentage was calculated from historical accounting data including, amongst others, the estimated expenditures for business development.

131.     In reaching his estimate of 9.36% for G&A in 2010, Chao used an estimated 2010 expenditure of $846,211 for business development expenses.  This

number, and the others which he used in reaching this estimate, was based on the actual business development expenditures for 2009.

132.     Shah, however, did not submit Chao's provisional billing rate to the government, and did not use Chao's provisional billing rate for billing Calnet's costs plus contracts in 2010.

133.     Unlike the good-faith estimate of the provisional G&A rate estimated by Chao, Shah raised Chao's estimated business development expenses from $846,211 to $1,846,211 for business development costs in 2010. Shah simply added $1 million to Chao's provisional expenditure estimate of $846,211, for a total estimated expenditure of $1,846,211 in 2010.

134.     The result of Shah's adding an extra million dollars into the provisional G&A calculation is that the provisional indirect rate for G&A was raised from 9.36% (i.e., Chao's good-faith provisional rate calculation) to 12.01%.

135.     Also in March, 2010, Shah ordered Chao to send Calnet's provisional billing rates to DCAA; the rates Shah ordered Chao to send did not include Chao's good-faith calculations. Shah ordered Chao to submit the fictional provisional indirect rate which Shah created himself. Shah had no concrete plan in place to spend an additional $1 million on business development in 2010, and Shah had no intention of actually spending the additional $1 million for business development.

136.     Instead, Shah increased the business development expenditures from $846,211 to $1,846,211 in order to increase the G&A cost pool from 9.36% to 12.01%. Such an increase was not in good faith.

137.    The result of the increased G&A cost pool was that Calnet's overall
indirect rates were increased submitted false claims on all of its cost plus
contracts; such claims were false because the increase in indirect costs was not
done in good faith, but was rather done with the intention of obtaining an
overpayment.

138.    The above-referenced acts constitute a violation of § 31 U.S.C.
§3729(a)(1)(A) and (B)(2009) of the False Claims Act, and resulted in damages to
the United States.  Alternatively, the above referenced acts were a violation of §§
3729(a)(1) and (2) of the False Claims Act and resulted in damages to the United
States.

139.    WHEREFORE, Relator respectfully requests that the Court enter
judgment against DEFENDANTS KALEEM SHAH AND CALNET, INC.,
JOINTLY AND SEVERALLY, as follows:  (a) That the U.S. be awarded three
times the damages sustained in an amount to be proved at trial; and  (b) that a
civil penalty of $11,000 be imposed for each and every false claim that defendants
presented to the U.S. and/or caused to be presented to the U.S.; and (c) that pre-
and post-judgment interest be awarded, along with reasonable attorneys' fees,
costs, and expenses incurred by the relator in prosecuting this case; and (d) that
the relator be awarded the maximum percentage of the government's recovery
allowed pursuant the False Claims Act; in addition, the relator requests any
additional relief the court may deem appropriate.


140.    Trial by jury is demanded.

Respectfully Submitted,

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator Kimthy Chao
Cook Kitts & Francuzenko, PLLC
3554 Chain Bridge Road, Suite 402
Fairfax, Virginia 22030
Phone: 703-865-7480
Fax: 703-434-3510
Email: zkitts@cookkitts.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2010 I transmitted a copy of the foregoing Amended Complaint via regular U.S. mail and Electronic Mail to the following:

Gerard Mene
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
gerard.mene@usdoj.gov

Stan Alderson (Dept. of Justice)
PO Box 14660
Ben Franklin Station
Washington, D.C. 20044
stanley.alderson@usdoj.gov

Respectfully Submitted,

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Plaintiff
COOK KITTS & FRANCUZENKO, PLLC
3554 Chain Bridge Road, Suite 402
Fairfax, Virginia 22030
Phone: 703-865-7480
Fax: 703-434-3510
Email: zkitts@cookkitts.com